Good afternoon. May it please the Court, my name is Lisa Neal, and I am counsel for the Plaintiff and Appellant Identity Intelligence Group, which I will refer to as IDIQ. Your Honors, I would like to reserve four minutes for rebuttal. All right. Thank you. IDIQ appeals from the District Court's decision denying IDIQ's motion for preliminary injunction, which sought an order directing the return of IDIQ's domain, rocketcreditscores.com, to IDIQ, a domain IDIQ registered in October of 2020 and used for nearly two years to market its identity theft protection and credit monitoring services. In early 2022, after nearly a year and a half of IDIQ using this domain and marketing its rocketcreditscores domain, the timing is interesting because Rocket Mortgage was actually not in the credit service monitoring industry until late 2021. Well, can we address the likelihood of success on Merit's claim? Yes. Because having Rocket together with something that is related to, you know, the mortgage and home buying process, which credit scores is, does I think it's reasonable to hear that and think, well, that's probably affiliated with Rocket Mortgage, when you hear rocketcreditscores. And that is essentially the heart of the claim. Why don't they have a likelihood of success on that claim, given that, you know, there's a likelihood of confusion, and they had a consumer survey that showed that people do, in fact, confuse it. Your Honor, actually, the district court held in the applicable law, it's clear that there was no confusing similarity between the domain rocketcreditscores and any of Rocket Mortgage's trademarks. If you look at the Bourgeois case, it's Bourgeois versus EWC, which is 7F41079. The court is to look solely at the domain itself. Well, what they're saying is you have your classic sleek craft factors, and then this says, well, we pull one out. We don't look at whether they're in the same market, because there's trolls who are not interested in being in the market, and so the statute removes that factor. But that doesn't create an immunity where, when you look at the confusion of the name itself, you sort of immunize the notion that what the goods are, because it may put it into the name, and so here, it's in the name, and it's relevant to contributing to confusion. I don't see that, I don't know how to pronounce Boigris, or whatever, Boigri, I don't see that that creates an immunity to considering it when it's in the name itself. Well, Your Honor, what the rule is, is that you look solely at the mark and compare it to the domain. It is without regard to any of the goods and services, and while I appreciate your comment that sometimes the goods and services are in the name of the mark, what you're looking at is the site, whether there's confusing similarity between the site. And the domain name is Rocket Credit Scores. Right, and Rocket Credit Scores does not look anything like Rocket Mortgage. It doesn't look anything like Rocket Homes. It doesn't look anything like Rocket HQ, and it doesn't look anything like Rocket Loan. That's what the site analysis test is under the applicable law. If I do a website, Disney Books, that isn't confusingly similar to the other Disney trademarks? People wouldn't think that that's a Disney website? Your Honor, in your example, Disney is the trademark, and the entire trademark is incorporated into the domain Disney Books. If Rocket Mortgage had the trademark for Rocket Credit or Rocket Scores, then we would have a different case here, but that is not one of Rocket Mortgage's trademarks. They don't have Rocket Credit. They don't have Rocket Scores, and so the entirety of the trademark must be included in the domain in order to create a confusing similarity here. And there is not one case since this statute has been acted where any court has found that there is a confusing similarity where there is only a portion of the trademark, and here that portion would only be Rocket, right? And Rocket is a very descriptive term. It's used in hundreds, probably thousands of different domains, including Rocket.com, Rocket Lawyer, Rocket Dollar, Rocket Agents, Rocket Financial. There's lots of Rocket domains, and there's lots of Rocket marks that include that term. But here, it's not Rocket Mortgage Credit Scores.com. It's not Rocket Loan Credit Scores.com. It was Rocket Credit Scores. That's entirely distinct and different from Rocket, any of their trademarks, Rocket Mortgage, Rocket Homes, Rocket Loan, and Rocket HQ. So that's the site analysis test. Sorry, I didn't mean to interrupt you. Can I have you address the irreparable harm? Because I'm having a hard time seeing irreparable harm in light of your CFO and marketing officer's testimony. So if IDIQ was able to pivot fairly quickly, and there's loss of business on that day, but you basically didn't lose any business on any subsequent days after, I don't see how you could show irreparable harm under these circumstances. Thank you for that question, Your Honor. And I'm really happy to address that because when Rocket Credit Scores was immediately and suddenly taken down, my client, IDIQ, had to immediately pivot and immediately fail this over to a new domain in order to mitigate its damages. Right, but it successfully pivoted, right? Was able to redirect all the traffic, and then there was some disruption on that day. But as I think the marketing officer, maybe it was the CFO, getting their evidence mixed up. But they, in combination, pretty clearly indicated that IDIQ was able to successfully pivot. And so any damage done was maybe on that day where the domain was lost, but really no irreparable damage. You can prove damages subsequently, but no irreparable harm for purposes of this appeal. And Your Honor, I think it's really important to note that was a mitigating factor that my clients put into play for a very short period of time. There was only about a month between the time they lost the domain and that preliminary injunction hearing. And you're right, during that time, while my client was mitigating their damages, it was successful in creating a band-aid. But the reality is, it has not long-term been successful because my client is no longer even marketing the Rocket Credit Scores name anymore because it's lost the domain. That is the irreparable harm. The domain itself is unique. The domain itself constitutes a unique right to property. And the sudden and unexpected immediate loss of the domain is itself irreparable harm. And it's because of that that my clients were forced to ultimately pivot away from the Rocket Credit Scores brand, a brand that it developed starting in October of 2020 before Rocket Mortgage was even in this space, long before Rocket Mortgage tried to enter this space. And so, in Rocket Mortgage's argument that all we needed to do was change the links. Well, that is belied by the fact that Rocket Mortgage initiated these proceedings, the UDRP proceedings. Why? Because the domain has intrinsic value, because the domain is valuable, because they want the domain. That's why they did it. And so, Rocket Mortgage sought to seize the domain as its own and begin offering these credit monitoring services. It's clear from Rocket Mortgage's own actions that the domain itself is unique, it should be treated like property, and the loss of the domain itself for my clients constituted irreparable harm on that very day. And since then, there has been a loss of business opportunities. My client has been forced to deal with all of its marketing affiliates in terms of changing things over, switching its brand, and it lost all the time, resources, and everything it went into developing the Rocket Credit Scores brand over almost a two-year period of time. So, that is all gone, and that also constitutes irreparable harm. The argument was raised by IDIQ throughout the underlying proceedings with regard to this irreparable harm caused by the loss of its brand. It's included in IDIQ's post-hearing briefs very clearly, and it was interesting to me as I was preparing for this, going back and reading all that and seeing, wow, we predicted this because what we argued was, absent injunctive relief, returning the domain to IDIQ, the Rocket Credit Scores brand is going to die, and it effectively has. IDIQ is going to have to start over with a new brand, which it has. Existing business relationships and business will be lost, years of effort poured into the goodwill of the successful Rocket Credit Scores brand will be wasted. All of that happened here. And, Your Honors, I would also like to address with regard to the irreparable harm issues that IDIQ should be entitled to the rebuttable presumption of harm under 1116A because it has established a likelihood of success on the merits here. And the likelihood of success on the merits, again, is because this domain is not, under the law, confusingly similar to any of Rocket Mortgage's trademarks. That finding is dispositive. You don't even get to the bad faith factors because you can't register a domain that is not confusingly similar in bad faith. It just makes no sense. You can register a domain that is confusingly similar and not have bad faith, but you can't have the opposite here. Do you want to save some time? Yes. Thank you. I will save my time. Good morning, Your Honors, and may it please the Court. David Zimmer on behalf of Applee Rocket Mortgage. And, Your Honors, I'd like to start with this irreparable harm issue and keep in mind that the District Court held a full, day-long, in-person evidentiary hearing on IDIQ's motion, and it made factual findings that IDIQ, based on the record before it, had not met its burden of proving irreparable harm. Do they get the presumption under 1116? No, they very clearly don't get the presumption under 1116 because that presumption on its face only applies to motions for preliminary injunction where you're seeking to prevent a violation of the ACPA. And IDIQ is not seeking to prevent a violation of the ACPA. That provision was added to protect trademark holders, and IDIQ is not seeking to assert its mark. So, based on the very straightforward text of 1116, it's just inapplicable here. The first sentence of that provision refers to injunctions that authorize the District Courts to issue injunctions to prevent a violation of the statute. And the second sentence grants the presumption for any such injunction, and IDIQ just isn't seeking that type of injunction at issue in 1116. And so, IDIQ bore the burden of proving, of introducing evidence that it was likely to suffer irreparable harm absent an injunction. The District Court considered the testimony, considered the evidence, and ruled against IDIQ on the merits, and that factual finding is entitled to clear error. And notably, counsel did not even reference the clear error standard in her argument. And in fact, that's because a lot of what she, what counsel was saying isn't in the record at all. And I'd encourage the Court to ask for record citations for some of these assertions, like that they're not, that they're still not using the brand. They've lost control over the brand. Well, look at pages 131 to 134 of the record. You see their Chief Marketing Officer testified they're still using all of the same marketing materials they used before the domain transferred. Why? Because the domain was just a link that people clicked through from their affiliate, from their affiliate banner ads. That's at page 97 of the record. Again, straightforward testimony from their Chief Marketing Officer that they don't market this domain to the consumers. The domain didn't really matter because customers were clicking through from the links. You know, again, she claims that they're losing business opportunities, you know, but I just, with their affiliates and losing customers. But you can just look at the testimony from their own executives. And if you look at page 134, this is testimony from IDIQ's Chief Marketing Officer. And I'm just going to read it because it's so clear. The question is, but your overall traffic and your overall customer base has not dropped, correct? You heard Mr. Sullivan, the CFO, testify to that earlier today. Answer? Correct. Question? And you agree with that, right? Answer? Yes. So again, the district court was well within its discretion in crediting this testimony from IDIQ's own executives. You look at page 168. Again, the Chief Marketing Officer testified they can't point to any loss of business. Not a single affiliate marketer has left. Not a single affiliate marketer has told them that they don't trust IDIQ anymore. This is all live testimony that the district court evaluated and made factual findings on this irreparable harm piece. And IDIQ simply has no argument, based on the actual record that was before the district court, that the district court committed clear error in addressing that, in addressing that really fundamentally factual question. You know, and I think if you look at IDIQ's briefs, they don't even, you know, they don't even really make a clear error argument in the briefs. They try to gin up these legal issues with what the district court, with the district court's irreparable harm analysis. I think it's notable the council didn't even really rely on those legal arguments this morning, and that's for good reason, because the district court clearly understood the correct standard that it's likely irreparable harm, stated that standard at least three times in its decision. This analogy to real property the council referenced is just a red herring in the sense that even owners of real property, of unique property, bear the burden, if they want a preliminary injunction, of showing up in court and proving that loss of access to that real property will lead to irreparable harm. That's the burden that IDIQ bore, just like every other person, every other party seeking a preliminary injunction. And the district court made factual finding that IDIQ didn't meet that burden. So again, and there's that factual finding of no likely irreparable harm is enough on its own to support the district court's decision, because under numerous decisions from this court, like Center for Food Safety, if a party seeking a preliminary injunction can't show that it's likely to suffer irreparable harm, that's the end of the matter, and the district court recognized that, and that's enough to affirm. I do, though, since I have some time, and if the court doesn't have any additional questions about irreparable harm, want to respond on the confusing similarity point, because that is the one place where we do think that the district court got the legal standard wrong. It wasn't ultimately, it didn't ultimately matter for the district court's decision, but since counsel addressed it, and Judge Collins, you have some questions about it, I think that IDIQ's approach to confusing similarity really ignores the statute, and from this court, and I point the court in particular to DSPT International v. Nahum, which we cite on page 48 of our brief, which I think makes clear that the question is not the sort of abstract kind of comparing letters approach that IDIQ advocates for. In DSPT International v. Nahum, this court looked to, affirmed a jury verdict, finding confusing similarity by looking to evidence of actual consumer confusion, and noted there was evidence in the record that real world consumers were confused about the affiliation between the domain and the trademark, and the relevant trademark. The 8th Circuit did exactly the same thing in Coca-Cola v. Purdy. It looked to evidence that actual consumers in the real world were confused, and that's no surprise if you just look at the statute itself. The phrase is confusing similarity. It's not asking whether there's similarity in the abstract, whether the letters overlap. It's asking whether there's the type of similarity that would be confusing, and confusing to who? Well, obviously to the people going to these domains and thinking that there might be a connection between the domain and the trademark. And even this boigrass case, I will confess equal confusion about how to pronounce the name of the case, but whatever it is, the 11th Circuit's decision, the counsel referenced, if you look at the 11th Circuit's actual holding, it was that the domain and the mark were confusingly similar because they, quote, bear such a visual resemblance that internet users would reasonably assume that the names were modified, used, approved, and or permitted by EWC, which was the mark holder in that case. That is exactly the question that we put to the District Court. That's why the surveys we introduced were so probative, and really, I think that— There was a rebuttal expert report that the court really didn't engage in analyzing. Correct. No, and that's exactly what we fault the District Court for. I mean, you know, there could have been a battle of the experts about sort of how probative those surveys were, but the District Court, because it applied this sort of more constrictive test, just treated them as irrelevant. It didn't make any kind of findings about how valid they were, and we think that that was error. The District Court should have looked at that and looked at the actual test that this court applied in DSPT International, that the 8th Circuit applied in Coca-Cola v. Purdy, and that the 11th Circuit applied in boigrass. So, again, we don't think this court needs to get into the merits, because the irreparable harm finding is not clearly erroneous, and that's enough. But if it does, we certainly think that there was very strong evidence of confusing similarity here. I agree with you that irreparable harm alone will be enough for an affirmance if we were to be persuaded by that analysis. But if we were going to go to the merits of confusing similarity, do we have to remand it for the District Court to engage in that analysis in the first instance? I mean, I think this court could go either way. I mean, I think that the record is relatively clear in the sense that for some of the reasons Judge Collins was getting at, that you have the word raw, that it was sort of undisputed, the credit scores are, you know, intimately related to the mortgage process. We have our survey evidence that was in the record. But certainly, to the extent that it's relevant, you know, the District Court could consider that if this court wanted to remand to clarify the legal standard and remand, you know, that would be fine. Now, that being said, you know, the District Court, in addition to finding that there was no irreparable harm showing here, it also sort of had an alternative holding that the whole, you know, the equitable factors, the winter factors as a whole did not support entering the injunction, even under its flawed approach to confusing similarity. So, I think the court can affirm for that ground, too, without, you know, without even diving into the confusing similarity issue independently, that the District Court still, despite sort of adopting a confusing similarity standard that was erroneously favorable to IDIQ, still viewed IDIQ's overall merit showing as being relatively weak and not strong enough to overcome the irreparable harm issue. So, for a lot of reasons, we think this court can affirm. I don't think this court would need to apply sort of the correct confusing similarity problem. The merits issue, I mean, your case would be closer to my Disney books hypothetical if you had had at the time the rocket trademark separately. And now, I understand from your 28-J that you've actually filed for that recently, but that's later. Well, no. So, just to be clear, Your Honor, we actually filed for it, and I believe it was 2017, which is three years before they registered the domain. And it was just granted recently. Just got it. We just... October 17, 2017, but just registered in January of 2020. Correct. And it's very clear under both the statute and this court's case law that the priority date for a trademark registration is the date of application and not the date that that application was granted. You can see that in 15 U.S.C. 1057C and also in this court's decision in Sengoku Works v. RMC. That's 96F3RD 1217, in which this court wrote that the registrant has granted a presumption of ownership dating to the filing date of the application for federal registration. So, when you register a mark, it goes in the PTO database, and you don't get the presumptions that are affiliated with registration until that application is granted. But once it's granted, those presumptions extend back to the date of the application. So, we've now amended our complaint in the district court to assert that registered mark, and that mark is certainly relevant. It's like the Disney books type of thing. Absolutely. Once you account for that rocket mark, which obviously wasn't before the district court, but that is exactly like the... If we were to get to the significance of that, we'd probably have to send that back. Correct. We're not asking this court to dive into the... I mean, that mark wasn't before the district court because it hadn't yet been granted yet. And for a whole host of reasons, we don't think this court needs to get into that. I mean, that's currently being litigated before the district court. We've amended our complaint to assert that. So, that's not something that this court needs to address. I certainly think it would preclude any order from this court actually somehow ordering that an injunction be issued. But for a host of reasons, the court doesn't need to get to that because there's so many reasons that this court can just affirm what the district court did. Either the irreparable harm piece or the overall balancing piece, or if it really came to it, reversing the confusing similarity, the flawed standard that the district court applied. If there are no additional questions, I'm happy to get back to Lorraine during my time. Thank you. Thank you. Thank you, Your Honors. Just a few quick points in rebuttal. First, I do want to make the point that the district court did abuse its discretion by applying the incorrect legal standard here. We were not seeking a mandatory injunction. We were seeking a prohibitory preliminary injunction to preserve the status quo. The question with respect to that is, when does the controversy arise? And it arises when the events forming the plaintiff's claims transpire. That's under the Fellowship of Christian Athletes case. Here, the events forming the plaintiff's claims, IDIQ's claims, transpired when the UDRP decision was rendered in July of 2022. Prior to that time, IDIQ possessed the domain. And therefore, the appropriate status quo here is to find- Wasn't the order to turn it over, wasn't like the same day as the complaint was filed? Or the turnover was the same day as the complaint? No, not exactly. So what happened is Rocket Mortgage filed an administrative proceeding in earlier in 2022. It's called the UDRP proceeding, the Uniform Domain Resolution proceeding. And as a result of a single arbitrator finding that IDIQ's domain was confusingly similar to the complaint in the district court under the ACPA seeking relief here under the Reverse Domain Name Hacking Statute 1114, which IDIQ did. But as IDIQ was preparing that claim for filing on the 10th day, GoDaddy, the registrar, actually prematurely transferred the domain. So the reality is, had GoDaddy not prematurely and improperly transferred this domain prior to the time it was supposed to, IDIQ would continue to have possession of this domain during the pendency of this litigation. And so that should really be the status quo that's applicable here. I want to address a couple of the other points that was raised by counsel on his- What's your response on their argument on the presumption? Because 1116A does refer to injunctions to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or to prevent a violation of subsection A, C, or D of section 1125. A plaintiff seeking such injunction. Now, how are you a plaintiff seeking that type of an injunction? Well, Your Honor, what I would point out is that this provision that was enacted in 2020, the Trademark Monetarization Act, should be read broadly. Because if it's read so narrowly that it would only apply to somebody like Rocket Mortgage, who is filing an action with regard to a specific domain, it would leave a client like mine, who's a registrant, who properly registered a domain, who's been properly using a domain, where there's been a finding of no confusing similarity between the domain and their marks, it leaves my client an alert, basically. I can't rewrite this. They didn't put that in. It's a registrant of a mark registered in the PTO, or someone who's seeking to prevent a violation of specified subsections of 1125. That's it. Well, yes, Your Honor. I think we are advocating for a broad reading of this statute, and a broad reading meaning that the presumption should apply to a broad category of plaintiffs. It doesn't apply simply to mark owners. It doesn't say it only applies to mark owners. The wording of the statute... This doesn't fit the plain language of the statute. I understand that... You're asking for an expansion beyond what the statute appears to provide for. Well, I think what we're advocating for here, Your Honor, is that the statute should be read to apply to both circumstances. And here, what we're arguing for is that our client has established the requisite likelihood of success on the merits of a violation, and that should include my client's alleged violation in the declaratory actions that it's seeking. They have asserted we're in violation of the statute. We are saying we're not in violation of the statute, and we have established a likelihood of success on that based on the district court's finding that it's not confusingly similar. All right. Thank you very much, both sides, for your argument. The matter is submitted. Okay. That concludes our calendar for today. So, in recess until tomorrow morning, all rise. Thank you. Court for this session stands adjourned until tomorrow.
judges: NGUYEN, COLLINS, Korman